RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 West Main Ave, Suite 300
Spokane, WA 99201
Telephone: (509) 835-5211
eichstaedt@gonzaga.edu

DREW A. HARKER (*pro hac vice*)
ANNE W. PEARLMAN (*pro hac vice*)
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Drew.Harker@arnoldporter.com
Anne.Pearlman@arnoldporter.com

(Additional Counsel Listed Below)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### SPOKANE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER WASHINGTON AND NORTH IDAHO; PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS; and PLANNED PARENTHOOD OF THE HEARTLAND, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX MICHAEL AZAR II in his official capacity as Secretary of the U.S. Department of Health and Human Services; and VALERIE HUBER in her official capacity as Senior Policy Advisor for the Office of the Assistant Secretary for Health at the Department of Health and Human Service, <br><br> Defendants. | Case No. 2:18-cv-00207-TOR <br><br> **NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION AND SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................. 3

   A. History of the TPP Program ......................................................... 3

      1. Congress Creates and Funds the TPP Program .......................... 3

      2. HHS Implementation of the TPP Program ................................ 5

         a. The 2010–2015 Grant Cycle ............................................. 5

         a. The 2015 Grant Cycle ...................................................... 7

      3. HHS's Attempts to Eviscerate the TPP Program ...................... 8

         a. New Political Leadership Opposes the Program ................... 8

         b. Defendants Unlawfully Terminate the 2015–2020 TPP Program Grants .............................................................. 11

         c. Defendants Issue the 2018 FOAs ..................................... 12

III. ARGUMENT ................................................................................. 13

   A. The 2018 FOAs are Unlawful ..................................................... 14

      1. The 2018 FOAs Violate the APA Because They Are Contrary to Law ............................................................................. 15

         a. The 2018 Tier 1 FOA Does Not Replicate Proven Effective Programming. ................................................. 15

         b. The 2018 FOAs Amount to Unlawful Transfers of Funds ...... 18

         c. The 2018 FOAs Undermine the Statutory Purpose of the TPP Program .......................................................... 20

      2. The 2018 FOAs Violate the APA Because They Are Arbitrary and Capricious ................................................. 20

      3. The 2018 FOAs Are *Ultra Vires* ..................................... 24

      4. The 2018 FOAs Are An Unlawful Augmentation of Funds In Violation of 31 U.S.C.A. § 1301(a) ................................. 25

   B. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ................... 26

   C. The Balance of Equities and Public Interest Merit an Injunction ............... 29

   D. Permanent Injunction and/or Summary Judgment are Appropriate ......... 30

IV. CONCLUSION ................................................................................ 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009)...................................................................27

*Ambach v. Bell*,
   686 F.2d 974 (D.C. Cir. 1982) ..................................................................28

*Arc of California v. Douglas*,
   757 F.3d 975 (9th Cir. 2014)......................................................................14

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)....................................................................................15

*City of Chicago v. Sessions*,
   264 F. Supp. 3d 933 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir.
   2018) ...........................................................................................................25

*City of Houston v. HUD*,
   24 F.3d 1421 (D.C. Cir. 1994) ...................................................................28

*City of Los Angeles v. Sessions*,
   293 F. Supp. 3d 1087 (C.D. Cal. 2018) ...........................................24, 25, 26, 27

*Cty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017)........................................................27

*Dep't of HHS Detail of Office of Cmty. Servs. Emps.*,
   64 Comp. Gen. 370 (1985)..........................................................................26

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017).......................................................................13

*Doe v. Trump*,
   288 F. Supp. 3d 1045 (W.D. Wash. 2017)..................................................28

*Drakes Bay Oyster Co. v. Jewell*,

    747 F.3d 1073 (9th Cir. 2014)...........................................................14

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009).........................................................................21

*Fence Creek Cattle Co v. U.S. Forest Serv.*,

    602 F.3d 1125 (9th Cir. 2010).........................................................14

*Harris v. Board of Supervisors, Los Angeles County*,

    366 F.3d 754 (9th Cir. 2004)...........................................................14

*Healthy Futures of Tex. v. HHS*,

    No. 18-cv-992, 2018 WL 2471266 (D.D.C. June 1, 2018) ...........12, 30

*Healthy Teen Network v. Azar*,

    No. 18-cv-468, 2018 WL 1942171 (D. Md. Apr. 25, 2018) ............ 12, 16, 22, 29

*Hoag Mem'l Hosp. Presbyterian v. Price*,

    866 F.3d 1072 (9th Cir. 2017).........................................................22

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,

    803 F.3d 389 (9th Cir. 2015)...........................................................26

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of*

    *Am. v. Donovan*,

    746 F.2d 855 (D.C. Cir. 1984) ........................................................15

*Jicarilla Apache Nation v. U.S. Dept. of Interior*,

    613 F.3d 1112 (D.C. Cir. 2010) ......................................................21

*Johnson v. Couturier*,

    572 F.3d 1067 (9th Cir. 2009).........................................................28

*King Cnty. v. Azar*,

    No. 18-cv-242, 2018 WL 2411759 (W.D. Wash. May 29, 2018) ...............11, 12

*League of Women Voters of U.S. v. Newby*,

    838 F.3d 1 (D.C. Cir. 2016) ............................................................29

*Longview Fibre Co. v. Rasmussen,*

    980 F.2d 1307 (9th Cir. 1992)...................................................................15

*Medina v. U.S. Dep't of Homeland Sec.,*

    No. 17-cv-218, 2018 WL 2214085 (W.D. Wash. May 15, 2018) ......................29

*Modesto Irrigation Dist. v. Gutierrez,*

    619 F.3d 1024 (9th Cir. 2010) ...................................................................21

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.*

    *Ins. Co.,*

    463 U.S. 29 (1983)...............................................................21, 22, 23

*Multnomah County v. Azar et al.,*

    No. 3:18-cv-01015-HZ (D. Ore.) ...............................................................1

*Nat. Res. Def. Council v. EPA,*

    777 F.3d 456 (D.C. Cir. 2014) ...................................................................15

*Pa. Dep't of Pub. Welfare v. Sebelius,*

    674 F.3d 139 (3d Cir. 2012)...................................................................26

*Perez v. Mortg. Bankers Ass'n,*

    135 S. Ct. 1199 (2015)...................................................................21

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS,*

    No. 18-cv-55, 2018 WL 1934070 (E.D. Wash. Apr. 24, 2018) ............. 12, 28, 29

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dept.*

    *of Health,*

    699 F.3d 962 (7th Cir. 2012)...................................................................28

*Planned Parenthood of New York City, Inc. v. U.S. Department of*

    *Health and Human Services et al,*

    No. 1:18-cv-05680 (S.D.N.Y) ...................................................................1

*Policy & Research, LLC v. HHS,*

    -- F. Supp. 3d ---, 2018 WL 2184449 (D.D.C. May 11, 2018)...........................12

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

**Statutes**

5 U.S.C. § 706 ........................................................................ 14, 16, 20

31 U.S.C. § 1301(a) ............................................................. 14, 25, 26

42 U.S.C. § 710 ............................................................................ 3, 5

Administrative Procedure Act Section 705 ........................................ 1, 13

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat.

    3034, 3253 (2009) ....................................................... 2, 3, 4

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat.

    348, 733 (2018) .................................................................. *passim*

**Other Authorities**

ECF No. 1 ..................................................................................... *passim*

Fed. R. Civ. P. 56(a) ........................................................................ 14

Federal Rule of Civil Procedure 65 ....................................................... 1

H.R. Rep. No. 111-366 (2009) .............................................................. 4

# I.    INTRODUCTION

Plaintiffs—Planned Parenthood of Greater Washington and North Idaho ("PPGWNI"), Planned Parenthood of the Great Northwest and the Hawaiian Islands ("PPGNHI"), and Planned Parenthood of the Heartland ("PPH")—hereby move, pursuant to Section 705 of the Administrative Procedure Act ("APA") and Federal Rule of Civil Procedure 65, for preliminary or permanent injunctive relief enjoining the U.S. Department of Health and Human Services, Alex Michael Azar II, in his official capacity as Secretary of HHS, and Valerie Huber, in her official capacity as Senior Policy Advisor for the Office of the Assistant Secretary for Health at the Department of Health and Human Service (collectively, "HHS" or "the agency") from implementing the 2018 Tier 1 Funding Opportunity Announcement (Ex. 1 of Decl. of Drew A. Harker,[1] "2018 Tier 1 FOA") and the 2018 Tier 2 Funding Opportunity Announcement ("2018 Tier 2 FOA") (collectively the "2018 FOAs").[2]

In 2009, Congress created the Teen Pregnancy Prevention Program ("TPP Program") to address rising teen pregnancy rates. Because past efforts to reduce teenage pregnancy were not always supported by evidence—and, in fact, were sometimes counterproductive—Congress chose to fund only "medically accurate" programs that reduce teen pregnancy through the TPP Program. Recognizing that a vast amount of scientific literature existed regarding effective programs, Congress

---

[1] All citations to "Ex. __" without any other descriptor are to the Exhibits included with the Declaration of Drew A. Harker.
[2] One other case involving the 2018 FOAs, and involving the same defendants, has been filed and is pending in the Southern District of New York. *Planned Parenthood of New York City, Inc. v. U.S. Department of Health and Human Services et al*, No. 1:18-cv-05680 (S.D.N.Y). Additionally, a case involving the 2018 Tier 1 FOA, and involving the same defendants, has been filed and is pending in the District of Oregon. *Multnomah County v. Azar et al.*, No. 3:18-cv-01015-HZ (D. Ore.).

committed the majority of its appropriation to "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009) ("2010 CAA"). Additionally, Congress committed the remainder of the program funding to establishing new programs and evaluating their effectiveness. *Id.*

The first eight years of the Program have been an unparalleled success, touted as such by HHS and Congress's bipartisan Commission on Evidence-Based Policymaking. *See*, *e.g.*, Ex. 8 at 4 (describing the Program's "increasingly rigorous portfolio[] of evidence"); Ex. 9 at 5 (finding that "[t]he number of evaluations demonstrating statistically significant positive impacts on behavioral outcomes represents a larger proportion than found in large evaluation efforts from other fields").

But in the view of the new political appointees currently overseeing the TPP Program, "evidence based programs" are a "[m]yth" and the TPP Program is a "sham" that "should be ended." To that end, in 2017, the Administration attempted to defund the program, but Congress rejected this course and chose to not only continue the program, but in all respects appropriated money on the same terms as years past. Having failed to persuade Congress, Defendants now unlawfully seek to effectively end the TPP Program on their own, and to repurpose the money allocated by Congress for their own ideological programs. Defendants first tried to terminate all 81 ongoing TPP Program grants, an effort that all four courts to consider the issue have held unlawful. In April, the day after courts began vacating those terminations, Defendants issued the new 2018 FOAs that purported to continue the TPP Program, but do so on terms that dramatically contradict Congress's unambiguous directive.

This case challenges this latest effort, which is unlawful in several respects. First, the 2018 FOAs violate the APA as they are contrary to law and arbitrary and capricious. Second, the 2018 FOAs are *ultra vires* beyond Defendants' authority. Third, the 2018 FOAs are an unlawful augmentation of appropriations.

For all these reasons, HHS must be enjoined from using the 2018 FOAs to select grantees and award funding. HHS has agreed not to award any funds under the new FOAs until September 1, 2018, but after that date HHS may disburse funds at any time—at which point it will be impossible to award a full remedy to Plaintiffs, and leave them irreparably injured. Accordingly, Plaintiffs respectfully request that the Court preliminarily enjoin implementation of the 2018 FOAs pending adjudication of Plaintiffs' claims, or proceed directly to the merits and issue a permanent injunction.

## II. STATEMENT OF FACTS

### A. History of the TPP Program

#### 1. Congress Creates and Funds the TPP Program

From 1980 to 2009, federal funding for sexual education was focused almost exclusively on programs that taught abstinence from all sexual activity as the "expected standard for all school age children." Such programs, commonly known as "abstinence only education" programs taught that any "sexual activity outside of the context of marriage is likely to have harmful psychological and physical effects." *E.g.*, 42 U.S.C. § 710. When Congress created such programs, evidence of efficacy of the programs was not required to receive federal funding.

In 2009, Congress created the TPP Program to "fund medically accurate and age appropriate programs that reduce teen pregnancy." 2010 CAA, 123 Stat. at 3253. Additionally, Congress defunded two of the programs awarding abstinence-only grants. *Id.*

In creating the TPP Program, Congress appropriated $110 million, mandating that "not less than $75,000,000" "shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors," and that "not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.* Any remaining amount was required to "be available for training and technical assistance, evaluation, outreach, and additional program support activities." *Id.* At the same time, Congress appropriated funds for the creation of the Office of Adolescent Health ("OAH") within the Office of the Assistant Secretary for Health at HHS, which would be tasked with overseeing the TPP Program, as well as $4,445,000 million "to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches," such as the TPP Evidence Review. *Id.*; H.R. Rep. No. 111-366, at 1043 (2009) (Conf. Rep.).

Since the creation of the TPP Program, Congress has appropriated between $100 million and $110 million each year for the program. Additionally, Congress has maintained the same delineation between "replicating programs that have been proven effective through rigorous evaluation" and "research and demonstration grants" at the same proportionate amounts. *See* 2010 CAA, 123 Stat. at 3253; *see also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 733 (2018) ("2018 CAA").

In 2018, Congress continued the TPP Program in nearly identical form, appropriating $101 million and requiring that not more than 10 percent of the funds go to "training and technical assistance, evaluation, outreach, and additional program support activities," with 75 percent of the remaining balance going to "replicating programs that have been proven effective through rigorous evaluation"

and 25 percent going to "research and demonstration grants." 2018 CAA, 132 Stat. at 733. Congress appropriated this funding despite a Presidential request to eliminate the TPP Program (discussed below). At the same time, Congress appropriated $6,800,000 for the TPP Evidence Review. *Id.*

Additionally, each year since 2012, and continuing with the 2018 CAA, Congress has explicitly funded a separate, smaller appropriation for competitive abstinence-only grants. This program was originally named the "Competitive Abstinence Education Grant Program" and then renamed the "Sexual Risk Avoidance Education Program" ("SRAEP"). Congress provided $25 million in funding "for making competitive grants which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity)" in the 2018 CAA. *Id.* at 733. Separately, Congress has provided an additional $75 million for the Title V State Abstinence Education Grant Program for both FY 2018 and FY 2019. *See* 42 U.S.C. § 710.

### 2. HHS Implementation of the TPP Program

#### a. The 2010–2015 Grant Cycle

In order to implement the TPP Program, in 2010, HHS undertook an independent, systematic review of the existing research literature on initiatives involving teen pregnancy prevention, called the "TPP Evidence Review." The TPP Evidence Review identified 28 programs that had documented positive effects concerning teen pregnancy prevention, sexual transmitted infections ("STIs"), and other associated sexual risk behaviors. The identified programs spanned a variety of approaches, including both abstinence education and comprehensive sexual health education, as well as youth development programs and programs for delivery in clinical settings and for special populations. *See* Ex. 5 at 12*,* 19.

OAH issued two Funding Opportunity Announcements ("FOAs") in April 2010. The FOAs invited applications for five-year grants that were split into "Tier

1 and "Tier 2." As required by Congress, the FOA for the Tier 1 grants ("2010 Tier 1 FOA") provided $75,000,000 solely "for the purpose of replicating evidence-based programs that have been proven through rigorous evaluation to reduce teenage pregnancy, behavioral risks underlying teenage pregnancy, or other associated risk factors." Ex. 3 at 3-4. To meet the application criteria, applicants were required either to choose from a list of the 28 effective programs, or to propose to replicate a program not already reviewed, but that would have to satisfy "a set of stringent criteria," including that the "research on or evaluations of the program model [met] the screening and evidence criteria" used for the evidence review. *Id.* at 6, 7. The 2010 Tier 1 FOA further instructed that in the event a proposed program "does not meet the evidence criteria, the application will be rejected and will not be considered." *Id.*

Applicants for funding through the 2010 Tier 1 FOA were also "required to maintain fidelity to the original evidence-based program model with minimal adaptations." *Id.* Fidelity is the "degree to which an intervention is delivered as designed" and the "[f]aithfulness with which a curriculum or program is implemented." *Id.* at 44. Significant adaptations would result in an applicant being ineligible for Tier 1 funding and, instead, "would entail applicants applying under Tier 2." *Id.* at 7.

Also consistent with the appropriation, the FOA for the Tier 2 grants ("2010 Tier 2 FOA") directed $25,000,000 in funding to "support research and demonstration programs that will develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy under the TPP program." Ex. 4 at 5.

Both FOAs contained application scoring criteria. Ex. 3 at 29-32; Ex. 4 at 29-31. The scoring criteria did not provide any points based on the ideology of the program, or even the specific content of the program. Additionally, both FOAs

provided that final award decisions will be made by the Director of the Office of Adolescent Health, either solely or in collaboration with the Commissioner of Administration on Children, Youth and Families. Ex. 3 at 32; *see* Ex. 4 at 31.

OAH funded 102 grantees through competitively awarded grants as part of the April 2010 FOAs—75 Tier 1 grants and 27 Tier 2 grants. Between fiscal years 2010 and 2014, the grantees' projects reached more than half a million young people in 39 states and the District of Columbia, trained a combined 6,100 facilitators, and created 3,800 community partnerships. ECF No. 1 at ¶ 43.

Both HHS and the bipartisan Commission on Evidence-Based Policymaking have touted the program as a leading example of evidence-based policymaking. *See*, ECF No. 1 at ¶¶ 54-55.

### a. The 2015 Grant Cycle

OAH announced a second round of five-year grants in 2015. As with the 2010 FOAs, "Tier 1" grants were issued for replicating evidence-based TPP programs ("2015 Tier 1 FOAs") and "Tier 2" grants for developing and evaluating new or innovative approaches ("2015 Tier 2 FOAs") (collectively the "2015 FOAs"). Ex. 6 at 3. The 2015 FOAs were further divided into Tier 1A/1B and Tier 2A/2B/2C grants to provide more guidance to applicants and emphasize particular areas of need. *See id.*

For example, the 2015 Tier 1B FOA directed applicants to choose an "evidence-based TPP program[] eligible for replication," which was defined as "a program that had shown evidence of effectiveness as part of the TPP Evidence Review and had been "assessed by the HHS TPP Evidence Review as being implementation ready, meaning that the program has clearly defined curricula and components, necessary staff supports and training, and specified guidelines and tools for monitoring fidelity." Ex. 6 at 11–12.

The 2015 Tier 1B FOA further "required [grantees] to implement evidence-based TPP programs with fidelity and quality" (Ex. 6 at 21) and awarded points to grantees based on, among other things, the "extent to which the applicant's plans for monitoring fidelity and managing adaptations are likely to result in implementation of evidence-based TPP programs with fidelity" as well as the applicant's experience "implementing evidence-based TPP programs on a large scale (i.e., at least 500 youth per year)" and in the target communities. Ex. 6 at 73, 74. Applicants were also awarded points based on the extent to which their programs were culturally inclusive and non-stigmatizing for all teens. Ex. 6 at 53, 73.

As with the 2010 FOAs, final award decisions for the 2015 FOAs were to be made by the OAH Director. Ex. 6 at 77; Ex. 7 at 79.

In July 2015, following a highly competitive grant application process, HHS awarded 81 new five-year TPP Program grants. *See* Ex. 20.

### 3. HHS's Attempts to Eviscerate the TPP Program

### a. New Political Leadership Opposes the Program

Notwithstanding the TPP Program's success, a handful of politically-connected opponents to the program have emerged. One such opponent is Defendant Valerie Huber, who currently oversees the Program. Prior to her political appointment at HHS, Ms. Huber strongly advocated for much of her career for abstinence-only education and the eradication of comprehensive sexual education from the nation's schools.

Prior to joining the Trump Administration, Ms. Huber served as the Executive Director of the National Abstinence Education Association ("NAEA") (now Ascend) from 2007 to 2017, a trade association for abstinence-only organizations. While at NAEA, Ms. Huber was instrumental in an effort to rebrand abstinence-only education as "sexual risk avoidance" ("SRA") education. *See* Valerie Huber, *From First Blush to Sexual Chaos*, at approx. 58:30-59:05, YouTube (Mar. 3, 2015),

www.youtube.com/watch?v=b8orU7_ISKM ("[W]e are moving away from the word abstinence. ... [W]e're actually in the process of rebranding even our organization.").

Abstinence-only advocates like Defendant Huber have coined euphemisms such as "optimal health behavior" (i.e., abstaining from all sexual activity outside of marriage) and "cessation" (i.e., ceasing all sexual activity if already sexually active). *See, e.g.*, Ex. 10 at 13 (defining "optimal health outcome" as "wait[ing] for marriage before engaging in sex"); *id.* at 38 ("The optimal health outcome is sexual delay, preferably until marriage."). As NAEA explained, "SRA education is built on the premise that all non marital teen sexual activity is high-risk behavior" and therefore focuses on "voluntarily refraining from all sexual activity, including, but not limited to sexual intercourse." *Id.* at 10 (emphasis omitted). In an SRA program, "all themes and topics within the program [must] encourage and empower teens to choose or regain a lifestyle that avoids all sexual risk." *Id.* at 37.

Ms. Huber contrasts programs incorporating SRA principles and optimal health goals with "teen pregnancy prevention" programs, which she calls "comprehensive sex education" or "sexual risk reduction." *Id.* at 3, 5, 19; *see also, e.g.*, Ex. 11 at 5 (defining "'[c]omprehensive' sex education" as a "[r]isk reduction approach" often used as a synonym for "pregnancy prevention"). According to Ms. Huber, such programs "normalize[] teen sex, and put[] the emphasis on reducing the risk, rather than eliminating it," making them incompatible with SRA principles. Ex. 12 at 2. For that reason, "[y]ou can't blend the two." *Id.* Further, according to Ms. Huber, only SRA programs should be funded. *See, e.g.*, Ex. 10 at 2 ("Discontinue federal funding for any programs that compromise teen health by normalizing sexual activity outside of marriage."); *id.* at 37 ("Any program that perpetuates the view that sexual experimentation is an acceptable risk behavior for teens should receive no taxpayer funds.").

In 2009, Ms. Huber stated her "strong opposition to" Congress's "funding for a new Teenage Pregnancy Prevention (TPP) program" because it did not "place heavy emphasis on risk avoidance." *See* Ex. 13 at 1. Once it was clear that Ms. Huber's efforts to thwart the creation of the program had failed, she continued advocating for Congress to defund the Program and dedicate all federal sex education dollars to abstinence-only programs. *See, e.g.*, Ex. 10 at 37.

In the spring of 2017, while she was still leading Ascend, Ms. Huber repeatedly lobbied HHS to eliminate both the TPP Program and OAH, notwithstanding that both are creations of Congress. *See* Declaration of Benjamin Link ("Link Decl.") Ex. 1; Link Decl. Ex. 2. In documents that Ms. Huber provided before a meeting with HHS officials, she opined that the TPP Program and OAH were "[u]nnecessary from the start, except to drive a harmful agenda that normalizes teen sex and a false 'evidence based' narrative," and therefore "should be immediately abolished." Link Decl. Ex. 2 at 8. In one document, she asserted that "evidence based programs" were a "[m]yth," and "the entire effort was a sham." *Id.* at 8, 9. In another, she argued "[h]arm reduction programs still place youth at risk and should be replaced" and that the TPP Program is a "radical approach" that is a "funding stream for Planned Parenthood and other pro-teen-sex groups." Link Decl. Ex. 1 at 3, 7.

Ms. Huber, ignoring that the TPP Program was mandated by Congress, urged HHS to "immediately halt the TPP program and redirect funds back to the risk avoidance message, from whence they came. The TPP program should be ended, restoring the funds to SRA programs." Link Decl. Ex. 2 at 8; *see also* Link Decl. Ex. 1 at 4 ("Defund the *Teen Pregnancy Prevention (TPP) Program* and restore this funding to SRA programs.").

Ms. Huber met with HHS officials on or about March 8, 2017, with a "time sensitiv[e]" request to "immediately halt" the TPP Program. Link Decl. Ex. 2 at 2, 8.

Two months later, Defendant Alex Azar, the Secretary of HHS, submitted a budget that proposed to "eliminate[] the TPP program." Ex. 14 at 6. Congress ultimately rejected this request, providing the 2018 appropriation described above.

On June 5, 2017, Ms. Huber was appointed Chief of Staff in the Office of the Assistant Secretary of Health ("OASH") at HHS, which oversees OAH and the TPP Program. Ms. Huber was subsequently named Senior Policy Advisor for OASH. In that position, her portfolio included OAH and the TPP Program, both of which she has long sought to abolish.

### b. Defendants Unlawfully Terminate the 2015–2020 TPP Program Grants

Less than a month after Ms. Huber's appointment in 2017, HHS informed all 81 current grantees that their grants would be terminated as of June 30, 2018. Such an early termination shortened their five-year grants by two years—even though HHS had already approved year-three funding two weeks before Ms. Huber's appointment. *See* Link Decl. Ex. 3 at 1-2. OAH staff were not involved in the decision and the grantees were given no reason for the terminations. *See, e.g.*, Link Decl. Ex. 4 at 2 ("OAH has not been part of the discussions. . . . I reminded him that OAH were not aware of the grant action until the last minute . . . .").

In response to public criticism and congressional concern, Defendants issued shifting post hoc explanations for the terminations. *See King Cnty. v. Azar*, No. 18-cv-242, 2018 WL 2411759, at *7 (W.D. Wash. May 29, 2018). Internally, OAH staff warned that those explanations recited statements that were false and misrepresented the data assembled by HHS in its years of administering the program. *See* Link Decl. Ex. 5 at 3-5.

Numerous grantees sued to enjoin the terminations, resulting in five injunctions by four different judges unanimously finding the terminations unlawful and requiring Defendants to process the plaintiff grantees' applications for the

fourth year of funding under lawful standards.[3] To date, HHS has filed an appeal in three cases; the deadline to notice an appeal remains pending in the others.

### c. Defendants Issue the 2018 FOAs

One day after the first court held the terminations of the 2015 grants unlawful, Defendants chose a new approach to ending the TPP Program by issuing the 2018 FOAs that allegedly implemented the Program but actually nullified Congress's choices. *See* Ex. 1; Ex. 2.

The 2018 FOAs provide "Tier 1" and "Tier 2" grants, with the Tier 1 grants receiving approximately 75% of the funding. However, the applicant requirements contained in the 2018 FOAs vary greatly from those of previous FOAs, *see* Appendix A, such that the 2018 FOAs are inconsistent with Congress's requirements and violate the law. ECF No. 1 at ¶¶ 68-87.

For example, the 2018 Tier 1 FOA fails to require that the applicant replicate programs that have been rigorously evaluated and proven effective as explicitly required by the appropriation language. *See* 2018 CAA, 132 Stat. at 733. Notably, the 2018 Tier 1 FOAs: (1) do not require that the applicant replicate programs at all, and (2) do not require that the applicant's program be rigorously evaluated and proven effective. The 2018 Tier 1 FOA does not contain the phrase "evidence-based" at all, the definition of "Evidence-Based Teen Pregnancy Prevention Programs" has been deleted as compared to the 2015 Tier 1B FOA, and even the

---

[3] *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, No. 18-cv-55, 2018 WL 1934070, at *1-2 (E.D. Wash. Apr. 24, 2018), *appeal filed* June 25, 2018; *Healthy Teen Network v. Azar*, No. 18-cv-468, 2018 WL 1942171, at *1-4 (D. Md. Apr. 25, 2018), *appeal filed* June 22, 2018; *Policy & Research, LLC v. HHS,* -- F. Supp. 3d ---, 2018 WL 2184449, at *2-5 (D.D.C. May 11, 2018), *appeal filed* June 15, 2018; *King Cnty. v. Azar,* No. 18-cv-242, 2018 WL 2411759, at *6 (W.D. Wash. May 29, 2018); *Healthy Futures of Tex. v. HHS*, No. 18-cv-992, 2018 WL 2471266 (D.D.C. June 1, 2018).

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

words "proven" and "rigorous evaluation" only appear when describing evaluations to be conducted *after* the programs are funded. *See* 2018 Tier 1 FOA at 19, 21-23.

Additionally, the 2018 Tier 1 FOA and the 2018 Tier 2 FOA both require the use of either the "Center for Relationship Education's Systematic Method for Assessing Risk-Avoidance Tool" (or "SMARTool") or the "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs" (or "TAC"). Appendix A; *see also* Ex. 1 at 12, 35 and Ex. 2 at 11. Both are "tools" and not programs. In addition, regardless of which "tool" applicants use, the 2018 Tier 1 FOA and the 2018 Tier 2 FOA require applicants to implement "additional expectations," which are characteristic of abstinence-only education, including weaving "optimal health" goals into every component of the project, "clearly communicat[ing] risk," "providing skills to avoid sexual risk," and "providing cessation support." Appendix A; *see also* Ex. 1 at 14–16 and Ex. 2 at 12–13.

## III. ARGUMENT

The APA grants this Court authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion" of these proceedings "as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Further, "[a] party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

The Ninth Circuit evaluates "these factors via a sliding scale approach, such that serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

injection is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (internal quotations omitted). "As a result, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be established by the party." *Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 759-60 (9th Cir. 2004) (internal quotation omitted). When the government is a party, the balance of equities factor merges with the public interest factor. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Plaintiffs are entitled to injunctive relief in this case.

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the questions are purely legal in nature, a court can resolve a challenge to a federal agency's action on a motion for summary judgment. *See Fence Creek Cattle Co v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). Under the APA, the court can "set aside" agency action if it is unlawful. 5 U.S.C. § 706.

**A. The 2018 FOAs are Unlawful**

The Court should enjoin Defendants from implementing the 2018 FOAs for at least four reasons. *First*, the 2018 FOAs are contrary to Congress's appropriation in the Consolidated Appropriations Act of 2018. *Second*, the 2018 FOAs are arbitrary and capricious because HHS reversed its prior practice without explanation, relied on factors not intended by Congress, acted contrary to the evidence before the agency, and entirely failed to consider important aspects of the problem. *Third*, the 2018 FOAs are *ultra vires* because HHS lacked authority to condition congressionally directed grant funding in this manner. *Fourth*, the 2018 FOAs are an unlawful augmentation of funds under 31 U.S.C. § 1301(a).

The Court should therefore grant summary judgment to Plaintiffs and enjoin implementation of the 2018 FOAs. If Plaintiffs' motion for summary judgment

cannot be resolved before September 1, 2018, the Court should enter a preliminary injunction to prevent irreparable harm and ensure that Plaintiffs have a complete remedy.

### 1. The 2018 FOAs Violate the APA Because They Are Contrary to Law

Congress created the TPP Program in FY 2010. As Congress provided the funds for HHS to create the TPP Program with specific instructions regarding the allocation of the funds, HHS must "distribute [its] funds among some or all of the permissible objects" specified by Congress. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.). Any agency action that is "untethered to Congress's approach," must be vacated. *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 469 (D.C. Cir. 2014). "[W]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312-13 (9th Cir. 1992) (quoting *Raleigh & Gaston Ry. Co. v. Reid*, 80 U.S. (13 Wall.) 269, 270 (1871)). When Congress provides clear intent, the agency, and the court, "must give effect to the unambiguously expressed intent of Congress." *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

### a. The 2018 Tier 1 FOA Does Not Replicate Proven Effective Programming.

Congress specifically directed HHS to spend 75% of its TPP Program funds on "*replicating programs that have been proven effective through rigorous evaluation* to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors," and the remaining 25% on "*research and demonstration grants* to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." 2018 CAA, 132 Stat. at

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

733 (emphases added). This gives courts "authority to ensure that when making [funding] decision[s] HHS considers statutory restrictions." *Healthy Teen Network*, 2018 WL 1942171, at *9.

The 2018 FOAs conflict with the statutory restrictions regarding the TPP Program and must be set aside under the APA, 5 U.S.C. § 706(2)(A). The 2018 FOAs are contrary to the plain language of the 2018 CAA in the following three ways.

*First*, the 2018 Tier 1 FOA does not require applicants to "***replicat[e] programs*** that have been proven effective ***through rigorous evaluation*** to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 2018 CAA, 132 Stat. at 733 (emphases added). The 2018 Tier 1 FOA does not require that applicants show that their programs have been rigorously evaluated or proven effective at reducing teenage pregnancy or such risk factors. In fact, ***no evaluation*** is required prior to funding under the 2018 Tier 1 FOA. The terms "rigorous evaluation" and "proven" effectiveness are only mentioned when discussing evaluations that will occur *after* the funding of selected programs. Ex. 1 at 19–21.

Indeed, ***replication*** of existing effective programs is not required at all by the 2018 Tier 1 FOA. Instead, the 2018 Tier 1 FOA specifically requires "adaptations" to programs to meet the new criteria imposed, even if such adaptations significantly change the programs as designed and previously evaluated. Ex. 1 at 12. The 2018 Tier 1 FOA requires applicants to "emphasize priorities" of Defendants' own choosing—SRA messages that preclude content "normalizing" sexual activity, Ex. 10 at 37—whether or not the programs being replicated were designed to contain that specific content. Ex. 1 at 14-16. Nor could *any* program that incorporates "optimal health into every component," Ex 1 at 14, 59, possibly replicate a program (let alone a proven one), given that the optimal health model *does not yet exist. See*

Link Decl. Ex. 6 (00:55) (explaining that HHS is currently "creating an optimal health model").

Additionally, the 2018 Tier 1 FOA does not require the replication of *programs*. Instead, the new FOA allows applicants to "choose any curriculum," whether or not it has been rigorously evaluated or proven effective, as long as it "addresses all of the key elements" in either of two "tools" designed to help educators select programs. Ex. 15 at 3, 11; *see also* Ex. 1 at 35; Ex. 16; Ex. 17. The two tools are the SMARTool and TAC. Ex. 1 at 12, 35; *see also, e.g.*, *id.* at 59.

These "tools" make no pretense to being programs and replicating "elements" of the tools is not replicating a program. The tools merely provide checklists of factors to assist in the design or selection of programs, as the tools themselves explain. The SMARTool is similarly a "tool" that "can be used to assess a variety of sexual risk-avoidance curricula and programs." Ex. 17 at 7; *see also, e.g.*, *id.* at 6 ("The [SMARTool] is a research-based tool *designed to help organizations assess, select, and implement effective programs and curricula* that support sexual risk avoidance." (emphasis added)). It is not a program itself, but rather provides "guidance on both programs and curricula." *Id.* at 9.

The SMARTool notes the difference between "evidence-based *programs* and promising approaches or evidence-based *practices*." Ex. 17 at 7. Evidence-based *programs* "have been formally evaluated, resulting in evidence that suggests the curriculum and/or program increases the possibility of desired outcomes for a demographically similar target audience." *Id.* at 8. By contrast, "[p]rograms using promising approaches or evidence-based practices" merely "contain components that are consistent with previously evaluated theories or methods." *Id.*

Similarly, the TAC is described in its own name as a "Tool to Assess ... Programs" (not itself a program). *See* ECF No. 1 at ¶ 75. It defines a "[p]rogram" as a "*set of activities* packaged in a purposeful way with the goal of preventing a

problem, treating a problem, and/or supporting an individual or a group." Ex. 16 at 54. The TAC itself, by contrast, is an "organized *set of questions* designed to help practitioners assess whether curriculum-based programs incorporated the common characteristics of effective programs." Ex. 16 at 6-7 (emphasis added); *see also id.* at 16-42 (recommending questions to ask when selecting or designing a program).

These "tools" provided in the 2018 Tier 1 FOA are not ***programs*** to be ***replicated*** as required by Congress. Congress clearly and plainly expressed that (what has become known as "Tier 1" of the TPP Program) should "replicat[e] programs that have been proven effective through rigorous evaluation." 2018 CAA, 132 Stat. at 733. And Congress prioritized that portion of the TPP Program, providing 75% of the programmatic funding for such replication of proven effective programming. *Id.*

### b. The 2018 FOAs Amount to Unlawful Transfers of Funds

The 2018 CAA created three relevant appropriations: (1) $75 million for the "Tier 1" funding, which requires "replicat[ion of] programs that have been proven effective through rigorous evaluation," (2) $25 million for the "Tier 2" funding, which funds "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy," and (3) $25 million for "making competitive grants which exclusively implement education in sexual risk avoidance." 2018 CAA, 132 Stat. at 733. These three funding pools are separate and distinct. The 2018 CAA also provides that HHS may transfer "not to exceed 1 percent of any discretionary funds…may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer." *Id.* at 736.

The 2018 FOAs, by their application scoring criteria and overall design, seek to transfer funds unlawfully between the three funding pools. Specifically, Defendants are transferring funds allocated to Tier 1 and Tier 2 TPP Program grants

to the third category of funds, grants to exclusively implement SRA education. That is because the 2018 FOAs prioritize sexual risk avoidance curricula and ideology over comprehensive sexual education and sexual risk reduction. To accomplish this, the FOAs award the largest share of points in the scoring criteria (25 out of 100 points) to applicants who incorporate abstinence-only messaging into their programs. ECF No. 1 at ¶ 80. Therefore, applicants who do not incorporate such messaging into their programs are at a distinct disadvantage to those who do. Congress clearly did not intend for the TPP Program to fund only programs that provide sexual risk avoidance education, as Congress provided a wholly separate appropriation funding for SRA education and, in fact, intended the TPP Program as a response to the ineffectiveness of SRA education. Had Congress so intended, the SRA education funding would have been provided with the TPP Program funds as well.

Additionally, Tier 1 appropriations are being unlawfully transferred to the Tier 2 funding category. By not requiring the 2018 Tier 1 FOA applicants to replicate programs that have been proven effective through rigorous evaluation, Defendants have, at best, made the Tier 1 and Tier 2 FOAs indistinguishable.[4] This is not what Congress intended, as Congress prioritized the Tier 1 funding, awarding it three-quarters of the funding under the TPP Program. Had Congress intended that the entire TPP Program funding would be interchangeable, Congress would have

---

[4] The stated purpose of the 2018 Tier 1 FOA is not to replicate proven programs but "to fund the *evaluation* of replication strategies that focus on protective factors shown to prevent teen pregnancy, improve adolescent health, and address youth sexual risk holistically." Ex. 1 at 17 (emphasis added). Recipients are expected to engage in "[f]ormative and process/implementation evaluation" in the first year, with the ultimate goal of a "summative evaluation" in the second year that will determine whether the "[f]ormative and process/implementation evaluation" was successful. *Id.* at 17-18, 20.

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

indicated as much. Negation of the requirements of Tier 1, and the effective transfer of funding to Tier 2, or another source, is also unlawful.

By effectively transferring all or the majority of the $75 million appropriated for the Tier 1 replication of programs to either the Tier 2 funds or SRA education, Defendants are transferring more than one percent between such appropriations in violation of the 2018 CAA. 132 Stat. at 733. And effectively transferring all or the majority of the $25 million appropriated for the Tier 2 funds to SRA education is also a transfer of more than one percent between such appropriations. *Id.*

### c. The 2018 FOAs Undermine the Statutory Purpose of the TPP Program

The congressional intent behind the appropriations for the TPP Program is clear: the TPP Program is to foster the replication and creation of evidence-based programming, based on rigorous evaluation of such programs. The appropriation for Tier 1 uses very specific words, including "evidence-based," "rigorous evaluation," "proven effective." 2018 CAA, 132 Stat. at 733. The Tier 2 funding mandated grants to "develop, replicate, refine, and test" additional models and "innovative strategies."

As described above, the 2018 FOAs undermine the statutory purpose of the TPP Program by rewarding ideology and devotion to abstinence-only principles instead of evidence-based programming. This prioritization of principles that are wholly irrelevant to the statutory purpose of the TPP Program, at the expense of the explicit requirements of the appropriation, unlawfully undermines the statutory purpose of the appropriation.

### 2. The 2018 FOAs Violate the APA Because They Are Arbitrary and Capricious

A court must set aside agency action which is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance of law." 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious if the agency "has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When choosing a course of action, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* An "agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50.

An agency departing from a prior policy must "display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original); *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (Where the government reverses an earlier determination, "[r]easoned decision making necessarily requires [an] agency to acknowledge and provide an adequate explanation for its departure from established precedent and an agency that neglects to do so acts arbitrarily and capriciously."). The APA "requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (internal quotation omitted). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 2125 (alteration adopted and internal quotation marks omitted). If the agency "implicitly departs from its prior precedent and provides no explanation for doing so," "[c]ourts will not assume an agency has engaged in reasoned decision making." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010) (alteration adopted and internal quotation marks omitted).

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

Defendants' actions violate the *State Farm* test in nearly every possible respect: Defendants relied on factors that Congress did not intend the agency to consider, failed to consider important aspects of the problem before them, failed to issue a reasoned (or any) explanation for their change in prior practice, and acted counter to the evidence before them. Accordingly, the 2018 FOAs are arbitrary and capricious and must be set aside.

*First*, Defendants "relied on factors which Congress had not intended it to consider" in their priorities and requirements in the 2018 FOAs. As described above, Congress did not intend for the TPP Program funding to be provided to SRA education. Had Congress so intended, the appropriation would have been drafted as such, or the appropriation would have been collapsed into the already existing SRA education appropriation. By the insertion of SRA education-based requirements, Defendants have relied upon factors that Congress did not intend to be considered in the TPP Program. Additionally, Defendants removed factors, such as proven effectiveness, and evidence-based programming, that Congress explicitly intended the agency to consider. By ignoring Congress's core requirement in favor of their own, extra-statutory policy preference, Defendants acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

*Second*, Defendants "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. When an agency does not consider "whether [a statutory] requirement would be satisfied," it acts arbitrarily and capriciously. *Hoag Mem'l Hosp. Presbyterian v. Price*, 866 F.3d 1072, 1081 (9th Cir. 2017). Here, Congress's design requires HHS to consider "(1) whether the program is aimed at preventing teenage pregnancy; (2) whether the program is medically accurate and age appropriate; [and] (3) whether the program has achieved proven results." *Healthy Teen Network*, 2018 WL 1942171, at *9. But as shown above, Defendants have removed—without acknowledgment—the requirement that

1  programs have been proven effective through rigorous evaluation from
2  consideration.

3       Moreover, as shown by the evidence discussed above, Defendants' new
4  requirement that all programs prioritize SRA content was imposed without regard to
5  whether it is likely to "prevent[] teenage pregnancy." Simultaneously, Defendants
6  *deleted* portions of the 2015 FOA that evaluated demographic disparities and other
7  correlates of teen pregnancy. The 2018 Tier 1 FOA makes no mention of the racial,
8  ethnic, geographic, or urban/rural variation among teen pregnancy rates, and
9  eliminates *all* findings and discussion of LGBT youth (*see* Ex. 1 at 6-8)—despite
10 HHS finding that these demographic categories correlate with massive differences in
11 teen pregnancy rates (Ex. 6 at 7-8). Similarly, the new FOA cuts all recognition of
12 the correlation between teen pregnancy and having been the victim of dating
13 violence and childhood abuse. Ex. 1 at 6-8; *compare with* Ex. 6 at 8-9. In other
14 words, Defendants have knowingly and inexplicably *weakened* their evaluation of
15 the core mission that Congress assigned to them.

16      *Third*, Defendants have offered no explanation for their decision to ignore the
17 requirements, the agency's past practice, and the evidence available to it. *State*
18 *Farm*, 463 U.S. at 43. By abandoning congressional requirements, the TPP Evidence
19 Review, and rigorous evaluation of programs, Defendants have disregarded the
20 evidence compiled by HHS previously.

21      For example, HHS has spent nearly a decade undertaking the TPP Evidence
22 Review, "a comprehensive and objective assessment of the relative strengths and
23 weaknesses of the teen pregnancy prevention literature." Ex. 19 at 6. The review has
24 examined several hundred studies of teen pregnancy prevention programs and found
25 only 48 programs for which rigorous evaluation had shown evidence of a positive,
26 statistically significant impact on at least one relevant outcome. *See* Ex. 18 at 1.

27
28

HHS released the latest edition of the TPP Evidence Review the very same week it issued the 2018 FOAs. *See* Ex. 18.

Yet with no explanation, the 2018 Tier 1 FOA discards the TPP Evidence Review altogether, even as the 2018 CAA continued to fund it. It ignores the TPP Evidence Review's finding that only four dozen specific programs had been proven effective through rigorous evaluation. Worse, it allows Defendants to award funds to programs that have already been proven *ineffective* through rigorous evaluation. This overruling of the evidence in the record is by design: Defendant Huber explicitly called the TPP Evidence Review a "sham" and a "[m]yth." Link Decl. Ex. 1 at 6, 7.

Additionally, Defendants have failed to consider evidence before the agency. Even the sources the new FOA cites confirm that the SRA education requirements that Defendants have imposed on all programs have not been proven effective through rigorous evaluation. ECF No. 1 at ¶ 85.

Any one of these flaws would require vacatur under the APA. In combination, they overwhelmingly compel the conclusion that Defendants must be enjoined from using the 2018 FOAs to distribute the funds Congress has made available through the TPP Program.

### 3. The 2018 FOAs Are *Ultra Vires*

"An agency 'has no power to act ... unless and until Congress confers power upon it.'" *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1095-96 (C.D. Cal. 2018) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)), *appeal filed*, No. 18-55599 (9th Cir.). "When agencies 'act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires.'" *Id.* (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). This doctrine is applicable to enjoin an agency that exceeds its authority in changing grant criteria dictated by Congress.

See *City of Los Angeles*, 293 F. Supp. 3d at 1098 (agency imposition of grant considerations not authorized by Congress was "ultra vires as a matter of law").

Defendants are attempting to use the 2018 FOAs as a way of eliminating the TPP Program, after this Court and other courts previously blocked the course. In doing so, Defendants are deliberately disobeying Congress's mandate to continue the TPP Program on unchanged terms. Defendants lack the authority to disregard the clear congressional mandate that the bulk of the TPP Program funds go to programs "proven effective through rigorous evaluation," 2018 CAA, 132 Stat. at 733, and to instead direct funds to programs that have never been evaluated. Additionally, Defendants lack the authority to disregard the distinction between the TPP Program and SRA appropriations.

Congress did not confer the power to alter the appropriation onto the agency. In fact, the 2018 CAA is very clear that HHS does not have the power to transfer funds between appropriations beyond one percent. 2018 CAA, 132 Stat. at 736. Defendants' attempt to rewrite these appropriations "exceed[s] statutory authority, and, consequently, the efforts to impose [these alterations] violate the separation of powers doctrine and are *ultra vires*." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018).

### 4. The 2018 FOAs Are An Unlawful Augmentation of Funds In Violation of 31 U.S.C.A. § 1301(a)

Title 31 U.S.C.A. § 1301(a) provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." Through the 2018 FOAs, Defendants attempt to use one appropriation to pay costs associated with the purposes of another appropriation. The 2018 FOAs transfer funds allocated to Tier 1 and Tier 2 grants to the SRA. Additionally, the 2018 Tier 1 FOA seeks transfer the funding for Tier 1 into the Tier 2 appropriation. The 2018 CAA does not provide otherwise, and indeed, expressly

limits transfers to no more than one percent between appropriations. As HHS itself has explained, public funds "may be used only for the purpose for which they were appropriated." *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 154 (3d Cir. 2012) (quoting brief filed by HHS); *see also, e.g.*, *Dep't of HHS Detail of Office of Cmty. Servs. Emps.*, 64 Comp. Gen. 370, 377 (1985) (acknowledging "the rule prohibiting unlawful augmentations of agency appropriations"). Thus, such transfer is unlawful under 31 U.S.C.A. § 1301(a). The 2018 FOAs thereby violate the statutory prohibition on augmentation of appropriations.

## B. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Plaintiffs and the populations that they serve require an injunction to protect against the imminent and irreparable injury they will otherwise suffer if the 2018 FOAs are upheld. The Ninth Circuit recognizes that a "rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015); *see City of Los Angeles*, 293 F. Supp. 3d at 1100 (holding that Los Angeles "will suffer irreparable competitive harm if [government] Defendants are not enjoined from imposing" unlawful grant conditions). The 2018 FOAs create just such a competitive disadvantage for Plaintiffs and other earlier TPP Program grantees.

*First*, the 2018 Tier 1 FOA does away with requirements of previous TPP Program Tier 1 FOAs which limited grantees to those applicants who could faithfully replicate evidence-based programs. ECF No. 1 at ¶ 70. The 2018 Tier 1 FOA will result in new applicants who do not have to meet the statutory criteria, disadvantaging Plaintiffs who have a proper track record of compliance with TPP Program requirements. Declaration of Karl Eastlund ("PPGWNI Decl.") ¶¶ 21, 32; Declaration of Willa Marth ("PPGNHI Decl.") ¶¶ 13, 46; Declaration of Andi Grubb ("PPH Decl.") ¶¶ 9, 30.

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

*Second*, the 2018 Tier 1 and Tier 2 FOAs both direct grant applicants to confirm that programming will "[c]learly communicate[ ] that teen sex is a risk," integrate "optimal health into every component" of their projects, and provide "cessation support" for teens who are already sexually active so that they might "make healthier and risk-free choices in the future." These are the 2018 FOAs' stated "Public Health Priorities," and the 2018 FOAs award a full quarter of the competition points to applicants who will incorporate them. However, these priorities are fundamentally incompatible with Plaintiffs' evidence-based, comprehensive and medically accurate programming and missions. (PPGWNI Decl. ¶¶ 26-28, 31; PPGNHI Decl. ¶¶ 40-42, 44-45; PPH Decl. ¶¶ 26-27, 29). Unable to include these priorities in their programming, Plaintiffs cannot compete on an equal footing under the 2018 FOAs, and suffer irreparable injury. *See City of Los Angeles*, 293 F. Supp. 3d at 1100 (holding that an injunction is required where "monetary damages cannot ensure that Los Angeles will compete on a level playing field in future grant cycles").

Looked at another way, the 2018 FOAs force Plaintiffs into a "kind of Hobson's choice" that the Ninth Circuit has recognized constitutes irreparable harm. For example, the 2018 Tier 1 FOAs require Plaintiffs to either forego TPP Program funding or forego implementing evidence-based, rigorously evaluated programming that align with their missions and values with fidelity. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009) (finding irreparable harm likely where plaintiff faced options that would either result in "loss of customer goodwill" or incur costs that "will disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone"); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537-38 (N.D. Cal. 2017) ("A plaintiff can suffer a constitutional injury by being forced to comply with an

MOTION FOR PRELIM. OR PERM. INJUNCTION AND SUMMARY JUDGMENT; CASE NO. 2:18-cv-00207-TOR

unconstitutional law or else face financial injury or enforcement action." (citing *Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058-59)).

Further, these injuries facing Plaintiffs are imminent. Any grants that HHS awards under the 2018 FOA before a preliminary injunction is granted will be impossible to unwind, and it will not be possible to recompete for those funds under lawful criteria. *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *see also id.* at 1427 ("[O]nce the relevant funds have been obligated, a court cannot reach them in order to award relief."). Plaintiffs therefore require "a preliminary injunction preventing the agency from disbursing those funds" in order "to avoid having [their] case mooted."[5] Without a preliminary injunction, Plaintiffs' potential remedy can only be a Court order enjoining against future unlawful awards.

Finally, Plaintiffs' inability to fairly compete and potentially gain TPP Program funding under the 2018 FOAs harms the young people in Plaintiffs' target communities who are denied the programming that Plaintiffs could otherwise provide. (PPGWNI Decl. ¶¶ 34-36; PPGNHI Decl. ¶¶ 51, 53; PPH Decl. ¶¶ 32-34). Such denials of federal funding that result in these types of harms have regularly been found to constitute irreparable injuries.[6]

_____

[5]  *See also Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *cf., e.g., Johnson v. Couturier,* 572 F.3d 1067, 1085 (9th Cir. 2009) (affirming preliminary injunction freezing disputed assets where there was an "inability to recover monetary damages, if relief [was] not granted").

[6]  *See, e.g.*, *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dept. of Health*, 699 F.3d 962, 980 (7th Cir. 2012) (irreparable harm where loss of funding would cause provider to lay off employees, close multiple clinics, and stop serving many patients); *Planned Parenthood of Greater Wash.*, 2018 WL 1934070, at *13 (unlawful termination of the TPP Program grants irreparably harmed the "youth (footnote continued)

## C. The Balance of Equities and Public Interest Merit an Injunction

The balance of equities and public interest factors weigh significantly in favor of judicial intervention. As a preliminary matter, Plaintiffs' communities, and the public at large would all be harmed if this Court does not enjoin the 2018 FOAs. *See*, *supra*, Section II.B; *see also*, *Planned Parenthood of Greater Wash.*, 2018 WL 1934070, at *13-15; *Healthy Teen Network*, 2018 WL 1942171, at *1 n.1. Further, there is a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Medina v. U.S. Dep't of Homeland Sec.*, No. 17-cv-218, 2018 WL 2214085, at *12 (W.D. Wash. May 15, 2018) (finding that a "public interest exists in ensuring that the government complies with its obligations under the law and follows its own procedures") (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

Any burden of an injunction on HHS would be minimal; simply ordering the agency to grant TPP Program funds to applicants that propose to replicate rigorously evaluated programs, regardless of whether they are sexual risk avoidance or sexual risk reduction models, consistent with Congress's mandate. HHS issued new 2018 FOAs *despite* the agency receiving multiple court orders to process the 2015 TPP Program grantees' applications. HHS "was on notice that the unexplained and

---

[grantees] serve, their staff, the communities, and Plaintiffs' reputation within those communities"; "remedies available at law, such as monetary damages, are inadequate to compensate for the injury to the youth and communities that Plaintiffs serve"); *see also, e.g.*, *Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017) (irreparable harm from "need to lay-off employees, reduce services, cancel established programs, lose institutional knowledge, and ultimately lose goodwill with volunteers and community partners" (citing *Stuhlbarg Int'l Sales Co. v. JohnD. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001))).

indiscriminate action that it took when [it terminated the 2015 grants] was on shaky legal ground, yet HHS apparently decided to recompete the TPP Program grant funding anyway, thereby knowingly exposing itself and third parties to the risk that future lawsuits or rulings relating to other similarly situated TPP Program grantees would upend the newly minted recompetition process." *Healthy Futures of Texas*, 2018 WL 2471266, at *6. HHS cannot now assert that a burden exists based on a problem of its own creating.

### D. Permanent Injunction and/or Summary Judgment are Appropriate

Additionally, for the reasons stated above, a permanent injunction and/or summary judgment on counts 1–4 of the complaint should be granted. Defendants' actions via the 2018 FOAs are (1) contrary to law, (2) arbitrary and capricious, (3) *ultra vires*, and (4) an unlawful augmentation of funds. No genuine issue of material fact exists regarding these claims, as the appropriation and the 2018 FOAs, on their face, are inapposite for the reasons described above. Therefore, a permanent injunction and/or summary judgment are appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court preliminarily or permanently enjoin Defendants from awarding grants under the 2018 FOAs, and grant summary judgment to the Plaintiffs.

DATED: July 16, 2018

Respectfully submitted,

By: */s/* Rick Eichstaedt

RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 WEST MAIN AVE, SUITE 300
SPOKANE, WA 99201
Telephone: (509) 835-5211
eichstaedt@gonzaga.edu

DREW A. HARKER (*pro hac vice*)
ANNE W. PEARLMAN (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000
Drew.Harker@arnoldporter.com
Anne.Pearlman@arnoldporter.com

ALICE C.C. HULING (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone:212.836.8000
Alice.Huling@arnoldporter.com

CARRIE Y. FLAXMAN (*pro hac vice*)
RICHARD MUNIZ (*pro hac vice*)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Ave, NW, Suite 300
Washington, DC 20005
Telephone: 202.973.4800
Carrie.Flaxman@ppfa.org
Richard.Muniz@ppfa.org

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I, Rick Eichstaedt, hereby certify that on July 16, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael J. Gerardi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7223
Washington, DC 20530
Tel: (202)616-0680
Fax: (202) 616-8460
E-mail: Michael.j.gerardi@usdoj.gov

By: /s/ Rick Eichstaedt
RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 WEST MAIN AVE, SUITE 300
SPOKANE, WA 99201
Telephone: (509) 835-5211
eichstaedt@gonzaga.edu

# APPENDIX A

## Comparison of 2015 Tier 1B FOA to the 2018 Tier 1 FOA

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Requires applicants to replicate programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors. 2015 Tier 1B FOA at 11–12. | Does not require applicants to replicate programs that have been proven effective through rigorous evaluation. |
| Uses the term "evidence-based" multiple times. *See, e.g.*, 2015 Tier 1B FOA at pp. 3, 4, 5, 6, 11, 12. | The phrase "evidence-based" does not appear at all. The term "evidence" is not used with regards to replicating programs; it is only used with respect to the collecting of evidence within the funded project itself. *See* 2018 Tier 1 FOA at 22–23. |
| Defines "Evidence-Based Teen Pregnancy Prevention Programs" as "[p]rograms identified by HHS as having undergone a rigorous evaluation been shown to be effective at preventing teen pregnancies, sexually transmitted infections, and/or sexual risk behaviors." 2015 Tier 1 FOA at p. 89. The FOA identifies the programs contained on the TPP Evidence Review as "Evidence-Based Teen Pregnancy Prevention Programs." *Id.* at 92. | Provides no definition of "Evidence-Based Teen Pregnancy Prevention Programs." The words "proven" and "rigorous evaluation" only appear when describing evaluations to be conducted *after* the programs are funded. 2018 Tier 1 FOA at 19. |
| Refers to the HHS TPP Evidence Review multiple times in setting forth which evidence-based TPP programs are eligible for replication. *See, e.g.*, 2015 Tier 1B FOA at 11. Requires applicants to choose a program on the TPP Evidence Review to implement and maintain fidelity to the program being implemented. *Id.* at 21–22. | Does not refer to HHS's TPP Evidence Review. Instead, requires applicants to utilize two "programs," the Center for Relationship Education's Systematic Method for Assessing Risk-avoidance Tool ("SMARTool") and the "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs ("TAC"). 2018 Tier 1 FOA at 12–13. |

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Provides a list of programs on the TPP Evidence Review in an appendix to the FOA. *See* Appendix D of 2015 Tier 1B FOA. | Provides a list of "elements" for both the SMARTool and the TAC. 2018 Tier 1 FOA at 12–13. With regards to the two "programs," applicants are only required to replicate each *element* of one of the two programs. *Id.* at 14. |
| Does not require applicants to include any specific information or concepts, so long as applicants are replicating the chosen program with fidelity. *See* 2015 Tier 1B FOA at 21–23. Significant changes to the program content could compromise a program's fidelity "and thus might affect the intended outcomes." *Id.* at 23. | Requires applicants to, beyond the "replication" of the elements of the "program" chosen, implement additional expectations. 2018 Tier 1 FOA at 14. |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "weav[e] the goal of optimal health into every component of the project." 2018 Tier 1 FOA at 14. The FOA does not provide a definition of "optimal health" except to say that it is "a term that refers to the best possible outcomes for an individual's physical, emotion and social health." *Id.* at 86. |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "provide skills to *avoid* sexual risk." 2018 Tier 1 FOA at 15 (emphasis added). "Providers should therefore place a ***priority*** on providing information and practical skills to assist youth in ***successfully avoiding sexual risk***," which is defined as "engaging in any behavior that increases one's risk for any of the unintended consequences of sexual activity." *Id.* at 15–16. (emphasis added). |

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must provide "cessation support." 2018 Tier 1 FOA at 16. Applicants must provide skills "for those engaged in sexual risk to make healthier and *risk-free choices* in the future…." *Id.* |
| Final award decisions will be made by the Director of the Office of Adolescent Health. 2018 Tier 1B FOA at 77. | Final award decisions will be made by the Director of the Office of Adolescent Health, "in consultation with the Assistant Secretary for Health." 2018 Tier 1 FOA at 63. |
| Allocates up to 30 points for an application's Program Approach, with particular value placed on the project's implementation of evidence-based programming and fidelity to such programming. 2015 Tier 1B FOA at 72–73. | Provides 25 points for replication of "effective elements" in the two "programs" *and* the application of "general expectations" regarding "optimal health," "communicating of risk," "skills to avoid risk," and "cessation support." |
| Relies upon the scientifically determined cognitive and social development of young people at various ages to define the term "Age Appropriate." 2015 Tier 1B FOA at 89. | Allows the grantee to determine what is or is not "age appropriate" for young people. 2018 Tier 1 FOA at 23–24 ("Recipients are expected to conduct their own review of all materials to ensure they are…age appropriate…."). No scientific evidence or third party analysis is necessary for such determination. |
| Requires applicants to ensure that "program materials are medically accurate, age appropriate, culturally and linguistically appropriate, and inclusive of Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) youth," and provides that OAH will conduct a review for medical accuracy before an applicant can use any materials. 2015 Tier 1B FOA at pp. 23–24. | Provides that materials are "expected" to be "medically accurate, age appropriate, culturally and linguistically appropriate, and trauma-informed." 2018 Tier 1 FOA at pp. 23–24. Applicants must "certify that all materials are medically accurate prior to use," but OAH will no longer review for medical accuracy unless "deemed necessary." Id. at 24. Omits any reference to LGBTQ youth. |

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Defines "Medical Accuracy" as "[v]erified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 2015 Tier 1B FOA at p. 90. | Defines "Medically Accurate" as "information [that] will be referenced to peer reviewed publications by educational, scientific, governmental, or health organization." 2018 Tier 1 FOA at 23. Information is not required to be "supported by the weight" of scientific evidence, but merely "referenced" to evidence. *Id.* |

## Comparison of 2015 Tier 2B FOA to the 2018 Tier 2 FOA

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Provides no requirements of substantive content or programming. | Requires applicants to address key elements of the SMARTool or the TAC. 2018 Tier 2 FOA at 11. |
| Provides no requirements of substantive content or programming. | Applicants must "weav[e] the goal of optimal health into every component of the project." 2018 Tier 2 FOA at 12. The FOA does not provide a definition of "optimal health" except to say that it is "a term that refers to the best possible outcomes for an individual's physical, emotion and social health." *Id* |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "provide skills to *avoid* sexual risk." 2018 Tier 2 FOA at 13 (emphasis added). "Providers should therefore place a *priority* on providing information and practical skills to assist youth in *successfully avoiding sexual risk*," which is defined as "engaging in any behavior that increases one's risk for any of the unintended consequences of sexual activity." *Id.* at 13. (emphasis added). |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must provide "cessation support." 2018 Tier 2 FOA at 13. Applicants must provide skills "for those engaged in sexual risk to make healthier and *risk-free choices* in the future…." *Id.* |
| Final award decisions will be made by the Director of the Office of Adolescent Health. 2015 Tier 2B FOA at 79. | Final award decisions will be made by the Director of the Office of Adolescent Health, "in consultation with the Assistant Secretary for Health." 2018 Tier 2 FOA at 56. |

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Does not allocate any points for substantive content or programming. Allocation of points is based on clarity of description, innovativeness, feasibility, scientific support, work plan, and design plan. *See* 2015 Tier 2B FOA at 71–76. | Provides 30 points for "Project Approach and Alignment to Expectations and Priorities," including the extent to which the "proposed project and approach ***fully aligned*** with the priorities and ***expectations*** of this FOA." 2018 Tier 2 FOA at 53–54. |
| Relies upon the scientifically determined cognitive and social development of young people at various ages to define the term "Age Appropriate." 2015 Tier 2B FOA at 91. | Allows the grantee to determine what is or is not "age appropriate" for young people. 2018 Tier 2 FOA at 20–21 ("Recipients are expected to conduct their own review of all materials to ensure they are…age appropriate…."). No scientific evidence or third party analysis is necessary for such determination. |
| Requires applicants to ensure that "intervention materials are medically accurate, age appropriate, culturally and linguistically appropriate, and inclusive of Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) youth," and provides that OAH will conduct a review for medical accuracy before an applicant can use any materials. 2015 Tier 2B FOA at pp. 20–21. | Provides that materials are "expected" to be "medically accurate, age appropriate, culturally and linguistically appropriate, and trauma-informed." 2018 Tier 2 FOA at pp. 20–21. Applicants must "self-certify all materials have been reviewed for medically accurate prior to use."" Id. at 21. Omits any reference to LGBTQ youth. |

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Defines "Medical Accuracy" as "[v]erified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 2015 Tier 2B FOA at p. 92. OAH undertakes a medical review prior to use. *Id.* at 21. | Defines "medically accurate" as "information [that] will be referenced to peer reviewed publications by educational, scientific, governmental, or health organization." 2018 Tier 2 FOA at 20. Information is not required to be "supported by the weight" of scientific evidence, but merely "referenced" to evidence. *Id.* |